UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re: TAMA MANUFACTURING :
    COMPANY, INC.,              :         Case No. 09-21395REF
    Putative Debtor               :

# MEMORANDUM OPINION

## I. INTRODUCTION

The petitioning creditors in this case initiated this involuntary bankruptcy on May 29, 2009. The petitioning creditors are former unionized employees who claim that putative debtor violated the WARN Act[1] by closing the company and terminating their employment without proper notice. The petitioning creditors' claims are derived from damages allegedly caused by putative debtor's violation of the WARN Act. Because the issue of the WARN Act notice is clearly the subject of a bona fide dispute by the putative debtor, I reject the petitioning creditors' standing to have filed this involuntary bankruptcy. I will therefore grant putative debtor's request to dismiss this involuntary case.

---

[1] See footnote 4, infra.

## II. FACTUAL BACKGROUND

Before April 13, 2009, when it ceased doing business, Tama Manufacturing Company, Inc. ("Tama") had been a clothing manufacturer that made primarily women's pants. In mid-2008, Tama employed approximately 200 employees, each of whom worked more than 35 hours per week. All of Tama's production employees were members of a labor union known as UNITE Here.

While it was in business, Tama had one, really major, customer – Alfred Dunner. Tama and Alfred Dunner had a long standing, 50+ year business relationship. In fact, with the exception of a brief period in 2007, when Tama acquired an Air Force contract, Alfred Dunner was Tama's only customer and provided 99.9% of Tama's overall sales.[2] From November 2007 through October 2008, Tama enjoyed almost $9,000,000 in sales to Alfred Dunner.

Because of the usual surge of business for the Christmas season, Tama's busiest season historically ran from September through December. Its slow season ran from January through February, with business beginning to pick up again in March through August. Generally, Alfred Dunner would give Tama a

---

[2] For a brief period in 2007, the Air Force contract comprised half of Tama's sales. The Air Force contract was short lived, however, because Tama "quickly had to get out of that contract [because] it just wasn't working." Notes of Testimony ("N.T."), September 21, 2009 hearing at 26, lines 12-13 (Testimony of Mark Fogelman).

four week delivery deadline that would begin to run from the date the order was placed with Tama.

During the 2006 and 2007 Christmas seasons, Alfred Dunner ran short on product that it had ordered from Tama. In preparation for the 2008 Christmas season, therefore, Alfred Dunner placed an order with Tama for 170,000 units. Unexpectedly, the 2008 Christmas season was the worst Christmas season in Alfred Dunner's history, with Alfred Dunner selling about 8,000 units a week instead of the projected 70,000 units per week. As a result of these decreased sales, Alfred Dunner did not place any new orders with Tama after the 2008 Christmas season. When this occurred, Tama anticipated, based upon its prior history with Alfred Dunner, that the lack of orders would be temporary and that business would pick up in March as it had in the past.

On January 27, 2009, therefore, Tama sent a letter to its employees notifying them that because Alfred Dunner had not placed any new orders with Tama and could not predict when it would be in a position to place new orders, Tama would suspend operations after the work already in the factory was shipped. See Exhibit P-2. The letter further explained that Tama's best estimate was that it would be up to eight weeks before it saw new orders of any significance, but that it was constantly looking for new business. The letter advised the employees that

Tama had set up a "window" for them to check for the latest information. Specifically, the letter advised: "Starting the week ending February 7, employees can call the factory on any Tuesday and Thursday morning from 9:00 a.m. - 12:00 a.m. at (610) 231-3100 and receive an update on any available information." Id. The letter concluded by stating that Tama "wish[es] each and every one of our employees the best in dealing with this difficult situation and look[s] forward to seeing you when we start up." Id.

Tama had experienced a temporary lack of orders from Alfred Dunner in the past, which had forced it to suspend its operations temporarily, for a month or two. When he sent the January 27, 2009 letter, therefore, Tama's President, Mark Fogelman ("Mr. Fogelman"), thought that the lack of orders was a temporary problem. He did not expect Alfred Dunner to permanently cancel all of its orders with Tama and cease doing business with Tama.

By January 29, 2009, Tama had no units left to cut and slightly more than 110,000 units left to sew, which would provide only two and one half more weeks of work for its employees. On or about February 3, 2009, Tama's financial condition collapsed when the president of Alfred Dunner called Mr. Fogelman and notified him that Alfred Dunner would not place any future orders with Tama. Alfred Dunner told Mr. Fogelman there was "no way to support Tama anymore

with stores closing, sales down, with the excess inventory, that there would just be no way to keep [Tama] going." N.T. September 21, 2009 at p. 32, lines 9 - 14. As Mr. Fogelman explained, when he received that phone call, Tama was "basically done in an instant." Id.

After receiving the call from Alfred Dunner's president, Mr. Fogelman immediately applied and was approved for a government assistance program to help Tama employees receive training and new employment. He also immediately called Tama's labor attorney, Marty Sobel, Esquire, and UNITE Here's Vice President, Gail Meyer ("Ms. Meyer"). Mr. Fogelman wanted to discuss the plant closing with Ms. Meyer immediately, but she was not available until February 6, 2009.

On or about February 6, 2009, Mr. Fogelman, Mr. Sobel, Ruth Green[3] and two of Tama's consultants, Ralph Carter and Tom Iaccoca, met with Ms. Meyer to discuss the plant closing. During this meeting, the Tama team explained to Ms. Meyer that Tama was forced to close the plant in the very near future because it had no work and that Tama would send a WARN Act[4] letter to its employees. Ms. Meyer appeared to be very understanding, and stated that she

---

[3] Ms. Green was an officer and director of Tama.

[4] WARN Act is an acronym that stands for the Worker Adjustment Retraining Notification ("WARN") Act, which is codified at 29 U.S.C.A. 2101 et seq.

-5-

wanted the opportunity to inform the Tama employees of the plant closing herself.

On February 10, 2009, Mr. Fogelman issued a "Notice Of Layoff To Affected Employees Pursuant To The Worker Adjustment And Retraining Notification (WARN) Act." See Putative Debtor's Exhibit P-1-6. In this Notice, Mr. Fogelman informed Tama employees that Tama had adopted a plan to shut down substantially all of its operations on or about April 13, 2009, but that some operations would continue. The Notice further informed the employees that they were being laid off due to the loss of business and related reorganization. The Notice went on to state that at the time of the shutdown, the employees' employment with Tama would be permanently terminated. Id.

The last of Alfred Dunner's orders were completed and shipped by Tama by the end of February 2009. Most of Tama's employees were laid off soon after the final orders were shipped.

## III. PROCEDURAL BACKGROUND

On March 11, 2009, Barbara Keiper, Edward Yost and Ernest Senefeld ("Petitioning Creditors"), on behalf of themselves and all similarly situated employees of Tama, filed a class action complaint against Tama in the United States District Court for the Eastern District of Pennsylvania, alleging violations of the WARN Act. The complaint is captioned <u>Keiper et al. v. Tama Manufacturing Company, Inc.</u> and is docketed at Civil Action No. 5:09-cv-01100-TMG. This action was stayed on May 29, 2009, however, when those same Petitioning Creditors filed this involuntary bankruptcy petition against Tama.[5] Tama answered the involuntary petition on July 17, 2009,[6] arguing that the Petitioning Creditors lack standing to file this involuntary petition because their claims are both (1) contingent as to liability and (2) the subject of a bona fide

---

[5] On January 11, 2010, Petitioning Creditors formally notified the District Court about this involuntary case and on January 14, 2010, the District Court placed the matter into suspense, pending the time when the litigation is no longer subject to the automatic stay of Section 362 of the Bankruptcy Code, 11 U.S.C. §362(a).

[6] On July 16, 2009, both parties requested that I vacate an order for relief that I had entered in this case the preceding day, July 15, 2009. They also requested that I extend the deadline for Tama to file its answer to the involuntary petition to July 17, 2009. On July 17, 2009, I entered an order approving the parties' request, vacating the July 15, 2009 order for relief, and extending the deadline for Tama to file its answer to the involuntary petition to July 17, 2009.

dispute.[7] Tama argues, therefore, that the involuntary petition must be dismissed. Tama's answer to the involuntary petition also alleges that the involuntary petition was filed in bad faith and seeks an award of costs and attorneys' fees against the Petitioning Creditors under 11 U.S.C. §303(i).

I conducted the trial on the issues raised in Tama's answer on September 4 and 21, 2009. Miscommunication and confusion between the parties' counsel, however, delayed transcription of the testimony of the trial until March 16, 2010. Briefs have now been filed and the matter is ripe for decision. Because I find and conclude that the Petitioning Creditors' claims are the subjects of bona fide disputes, and that the Petitioning Creditors therefore lack standing to file this involuntary petition, I will dismiss this involuntary petition pursuant to 11 U.S.C. §303(b)(1). I will also schedule a hearing on Tama's request for costs and attorneys' fees pursuant to 11 U.S.C. §303(i).   This Memorandum Opinion contains my findings of fact and my conclusions of law.

---

[7] 11 U.S.C. §303(b)(1).

# IV. LEGAL ANALYSIS

Only a creditor who holds a claim against the putative debtor that is neither contingent as to liability nor the subject of a bona fide dispute has standing to file an involuntary petition against the putative debtor. In re Raymark Ind., Inc., 99 B.R. 298, 299 (Bankr. E.D. Pa. 1989). Tama no longer presses its argument that the Petitioning Creditors' claims are contingent as to liability. The only issue before me, therefore, is whether the Petitioning Creditors' claims are the subject of a bona fide dispute.

Section 303(b)(1) of the Bankruptcy Code, 11 U.S.C. §303(b)(1), provides, in pertinent part:

> 303(b). An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title --
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount . . ..

Whether a petitioning creditor's claim is the subject of a bona fide dispute under section 303(b)(1) is determined by whether "there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." B.D.W. Assoc., Inc. v. Busy

Beaver Bldg. Centers, Inc., 865 F.2d 65, 66 (3d Cir. 1989) quoting In re Lough, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986). Stated another way, a bona fide dispute exists and an involuntary petition must be dismissed if substantial factual or legal questions exist regarding the putative debtor's liability to the claimant. Busy Beaver, 865 F.2d at 66-67. If a bona fide dispute exists, I am obliged to dismiss the involuntary petition; I am not permitted to decide the dispute. Busy Beaver, 865 F.2d at 66.

The Petitioning Creditors' claims against Tama are based upon Tama's alleged violation of the WARN Act and are pending before Honorable Thomas M. Golden in the District Court.[8] Specifically, the Petitioning Creditors argue that Tama violated Section 2102(a)(1) of the WARN Act because TAMA failed to provide its employees with sixty days written notice of the plant closing prior to the date the plant was closed.

Section 2102(a)(1) of the WARN Act provides, in pertinent part:

> An employer shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order --
>
> (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee;

---

[8] Keiper v. Tama Manufacturing Company, Inc., Civil Action No. 5:09-cv-01100-TMG. See also footnote 5, supra.

and

(2) to the State or entity designated by the State to carry out rapid response activities under section 2864(a)(2)(A) of this title, and the chief elected official of the unit of local government within which such closing or layoff is to occur . . ..

29 U.S.C. §2102(a)(1). The WARN Act applies to any business "that employs -- (i) 100 or more employees, excluding part-time employees; or (ii) 100 or more employees, including part-time employees, who in the aggregate work at least 4,000 hours per week, exclusive of hours of overtime." 20 C.F.R. §639.3(a)(1); see also Gross v. Hale-Halsell Co., 554 F.3d 870, 873 (10th Cir. 2009)

Tama concedes that it closed its plant in 2009 and that it was subject to the WARN Act when the plant was closed. Tama maintains, however, that it was excused from complying with the sixty day notice, which the WARN Act requires be provided to employees affected by a plant closing, because the closing was caused by an "unforeseeable business circumstance."

Section 2102(b)(2)(A) of the WARN Act provides: "An employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. §2102(b)(2)(A).

The regulations promulgated by the United States Department of Labor clarify this exception to the WARN Act's sixty day notice requirement and explain, in pertinent part:

> Section 3(b) of WARN sets forth three conditions under which the notification period may be reduced to less than 60 days. The employer bears the burden of proof that conditions for the exceptions have been met. If one of the exceptions is applicable, the employer must give as much notice as is practicable to the union, non-represented employees, the State dislocated worker unit, and the unit of local government and this may, in some circumstances, be notice after the fact. The employer must, at the time notice actually is given, provide a brief statement of the reason for reducing the notice period, in addition to the other elements set out in §639.7.
>
> . . .
>
> (b) The "unforeseeable business circumstances" exception under section 3(b)(2)(A) of WARN applies to plant closings and mass layoffs caused by business circumstances that were not reasonably foreseeable at the time that 60-day notice would have been required.
>
> (1) An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable. A government ordered closing of an

> employment site that occurs without prior notice also may be an unforeseeable business circumstance.
>
> (2) The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.

20 C.F.R. §639.9(b).

To satisfy the requirements of the exception for unforeseeable business circumstances, an employer must show: (1) The circumstance was not reasonably foreseeable; and (2) the plant closing was caused by that circumstance. Gross, 554 F.3d at 875. The scope of the unforeseeable business circumstances exception is dictated by the employer's commercially reasonable business judgment, rather than hindsight. Hotel Employees and Restaurant Employees Int'l Union Local 54 v. Elsinore Shore Assoc., 173 F.3d 175, 186 (3d Cir. 1999). When deciding whether a plant closing was reasonably foreseeable under the WARN Act, the Third Circuit instructs that a court shall "consider the facts and circumstances that led to the closing in light of the history of the business and of the industry in which that business operated." Elsinore Shore, 173 F.3d at 186.

A company will be excused from WARN liability based on the exception for unforeseeable business circumstances if, when confronted with a potentially devastating occurrence, it reacts as a reasonable employer within its own market would react. "The Act and its regulations necessarily recognize that even the most conscientious employers are not perfect, and they thus allow needed flexibility for predictions about ultimate consequences that, though objectively reasonable, proved wrong. So long as it may be fairly said that the eventual plant closing or mass layoff is caused by a sudden, dramatic, and unexpected event outside the employer's control, the exception applies." Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996)(footnote omitted).

Tama maintains that its failure to comply with the sixty day notice requirement of the WARN Act falls within the exception for unforeseeable business circumstances. Tama contends that the closure of its plant was the result of a "sudden, dramatic, and unexpected action or condition outside [its] control," because the closure resulted from its primary (only) customer's abrupt decision to permanently cease ordering product. As Tama points out, it had temporarily shut down operations in the past due to a lack of orders from Alfred Dunner after the Christmas season ended, but operations were always able to resume in early spring when Alfred Dunner would renew ordering merchandise. The dramatic downturn

in the national economy and Alfred Dunner's sudden decision to permanently cease all ordering from Tama, therefore, caught Tama by surprise, with insufficient time to comply with the WARN Act's sixty day notice requirement.

The Department of Labor's regulations recognize that both "[a] principal client's sudden and unexpected termination of a major contract with the employer . . . and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable." 20 C.F.R. §639.9(b)(1). The evidence shows that Tama was a victim of both of these circumstances. When either circumstance exists, the regulations specify that "the employer must give as much notice as is practicable to the union, non-represented employees, the State dislocated worker unit, and the unit of local government and this may, in some circumstances, be notice after the fact." 20 C.F.R. §639.9.

Other courts have applied the unforeseen business circumstances exception to situations in which an employer is required to effect a mass layoff or plant closing due to a major customer's sudden termination of its long standing relationship with the employer. Gross, 554 F.3d at 873-78; Local Union 7107 v. Clinchfield Coal Co., 124 F.3d 639, 641-43 (4th Cir. 1997); see also Loehrer, 98

Case 09-21395-ref    Doc 56    Filed 06/22/10    Entered 06/22/10 09:39:26    Desc Main
Document    Page 16 of 19

F.3d at 1061-63. As the Tenth Circuit recognized in Gross:

> Free enterprise always involves risk, yet most businesses operate as going concerns, notwithstanding those risks. Business downturns in a cyclical economy are not unusual, and we should not burden employers with the "task of notifying employees of possible contract cancellation and concomitant lay-offs every time there is a cost overrun" or similar difficulty. Such an indiscriminate practice could undermine morale, let alone exacerbate the problem. Such difficulties are invariable, and "most often do not lead to contract cancellation."

Gross, 554 F.3d at 877 (citations omitted).

The procedural posture of this involuntary bankruptcy case dictates that I may not decide whether Tama violated the WARN Act by failing to give the sixty day notice required by the Act. Busy Beaver, 865 F.2d at 66 ("If a bona fide dispute existed, the Bankruptcy Court was obliged to dismiss the petition, rather than resolve the dispute.") Instead, I must decide only whether Tama has established facts sufficient to show that the Petitioning Creditors' claims against it are the subject of a bona fide dispute. This is determined by whether Tama has "a meritorious contention as to the application of law to undisputed facts," or whether substantial factual or legal questions exist regarding Tama's liability to the Petitioning Creditors under the WARN Act. Id.

Upon the evidence before me, I find and conclude that Tama has established facts sufficient to show the existence of a substantial legal question

regarding Tama's liability to the Petitioning Creditors under the WARN Act. In particular, Tama has established facts sufficient to show a meritorious contention that the unforeseeable business circumstances exception to the WARN Act's requirement that an employer provide affected employees with sixty days notice of a plant closing applies to this case. I leave actual and final determination of the issue to Judge Golden in the class action pending in the District Court.

To the extent that the Petitioning Creditors take issue with the sufficiency of the information contained in the notices provided by Tama, I find and conclude that a meritorious contention exists that these notices were sufficient to comply with the WARN Act. First, I note that Tama provided prompt and full notice and disclosure of the cessation of its business to the union through Ms. Meyer, who expressly told Tama that she wanted the opportunity to inform the employees. Second, in Kalwaytis v. Preferred Meal Systems, Inc., 78 F.3d 117, 121 (3d Cir. 1996), the Third Circuit announced that "[f]lexibility in the notice requirement . . . is recognized by the provision that the notice is to be based on the best information available to the employer at the time the notice is served. 'It is not the intent of the regulations, that errors in the information provided in a notice that occur because events subsequently change or that minor, inadvertent errors are to the basis for finding a violation of WARN.' Fairly read, the regulations

require a practical and realistic appraisal of the information given to affected employees." citing 20 C.F.R. §639.7(a)(4). Based on this standard, I find and conclude that Tama has shown a meritorious contention that the notices it provided contained sufficient information to comply with the WARN Act.[9]

---

[9] The Petitioning Creditors also argue that the unforeseeable business circumstances exception does not allow an employer to provide no notice, or "after the fact" notice, of a plant closing to its affected employees. The Third Circuit indicated that this position is incorrect when it stated twice (in dicta) that "WARN's 60-day notice period is reduced or eliminated if the closing or mass layoff is 'caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required,'" Elsinore Shore, 173 F.3d at 180 (citation omitted), and that "[i]n the event that an unforeseeable business circumstance arises, the notice period may be reduced or eliminated." Id. at 187.

I also note that the February 10, 2009 notice is possibly contradictory. The exhibit and testimony relating to the April 13, 2009 plant closing were confusing. One interpretation could lead me to find that the notice was proper, but another interpretation could lead me to find faulty notice. Because I am prohibited from resolving the dispute, I will avoid adopting either interpretation and note that the language of the notice in and of itself could be found to create the bona fide dispute.

I therefore find and conclude that a meritorious contention exists that the notices provided by Tama were sufficient to comply with the WARN Act.

-18-

## V. CONCLUSION

Based on the reasons set forth above, I find and conclude that the Petitioning Creditors lack standing to file this involuntary petition because their claims against Tama are the subject of bona fide disputes. I will therefore enter the accompanying Order dismissing this involuntary petition and scheduling a hearing on Tama's request for costs and attorneys' fees pursuant to 11 U.S.C. §303(i).

BY THE COURT

DATE: June 22, 2010

_____
RICHARD E. FEHLING
United States Bankruptcy Judge